UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
ISIS KENNEY,

       Plaintiff,

v.

STATE OF NEW YORK, OFFICE OF
CHILDREN AND FAMILY SERVICES,

       Defendants.
--------------------------------------------------------------x

**OPINION AND ORDER**

16 CV 4522 (VB)

Briccetti, J.:

  Plaintiff Isis Kenney brings this action under Title VII of the Civil Rights Act of 1964 ("Title VII"), alleging defendants created a hostile work environment, engaged in quid pro quo sexual harassment, and that plaintiff was constructively discharged.

  Before the Court is defendants' motion for summary judgment. (Doc. #30).

  For the reasons set forth below, defendants' motion is GRANTED IN PART and DENIED IN PART.

  The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

## BACKGROUND

  The parties have submitted briefs, statements of fact ("SOF"), and affirmations ("Aff.") or declarations ("Decl.") with supporting exhibits, which reflect the following factual background.

  Beginning on November 27, 2014, plaintiff worked for the New York State Office of Children and Family Services ("OCFS") as a Per Diem Youth Division Aide ("YDA") at the Red

1

Hook Residential Center ("Red Hook"), a "non-secure residential facility for youths operated by OCFS located in Red Hook, New York." (Defs.' SOF ¶ 12).[1]

Anthony Lucky was the Assistant Facility Director at Red Hook, and Bernard Smith was the Facility Director. On any given day, plaintiff worked under one of two Administrators on Duty ("AOD"), depending on her shift. One of these AODs was Leon Davis.

At Red Hook, plaintiff primarily worked in the Central Services Unit ("CSU"), which is a "windowed, enclosed room located near the main entrance." (Defs.' SOF ¶ 28). Her tasks included answering the phone, performing security checks on visitors, storing employees' keys and electronic devices, monitoring surveillance cameras, "reporting on the movements of residents within the facility," (id. ¶ 29), and doing "perimeter checks." (Pl.'s SOF ¶ 20).

From November 27 to December 31, 2014, plaintiff worked a total of sixteen shifts with Davis at Red Hook.

Plaintiff testified that from the third day or so of her employment at OCFS, Davis began to tell her about his personal life, such as "complaining . . . about instances that were going on between him and the mothers of his children." (Sussman Aff. Ex. 1 ("Kenney Dep.") at 95). Soon thereafter, Davis began telling plaintiff "what he wanted and what he was looking for." (Id.).

Then, beginning in the second or third week of plaintiff's employment, Davis allegedly began more explicitly to sexually harass plaintiff. In particular, plaintiff alleges:

- Davis told her "he liked [her] . . . because [she] reminded him of a stripper and that [she] had the goods . . . the top, and the bottom." (Kenney Dep. at 95-96).

- He asked plaintiff "to stand up so that he could wand [her] with the metal detector." (Id. at 96).

---

[1] OCFS is an executive agency of the State of New York.

- He took plaintiff to a room in the basement of Red Hook, during what Davis told plaintiff would be a "brief tour of the facility," and although he "did not physically touch" plaintiff, he did "com[e] very close," and told plaintiff "there were no cameras" in the room. (Id.).

- He asked plaintiff if she thought about him over the weekend, and told her "several times that [she] was going to get him in trouble." (Id. at 97).

- He "would not stop coming to [her] office" and "[h]e would hang out there all day." (Id.).

- He "mad[e] a lot of . . . sexual, inappropriate terms and express[ed] himself inappropriately toward" plaintiff. (Id.).

- He told plaintiff she was "beautiful," "his type," that he felt "a connection" with plaintiff, and that she was "the kind of woman he would want to introduce to his mom." (Id. at 112).

- He gave her his cell phone number unsolicited. (Barkan Decl. Ex. J at 4).

Plaintiff alleges Davis's behavior "made [her] feel extremely uncomfortable" and that she told Davis "on numerous occasions that he needed to control himself and . . . have boundaries." (Id. at 97).

In December 2014 or early January 2015, plaintiff had an "in-depth conversation" with Lucky regarding Davis's conduct. (Kenney Dep. at 137). In response, Lucky told plaintiff that "Mr. Davis was wrong and that Mr. Davis did not have any boundaries." (Id. at 135).

From January 5 to 23, 2015, plaintiff attended a full-time off-site training session for new OCFS employees. During this period, she did not work at Red Hook or have contact with Davis.

While plaintiff was at the off-site training, the locks to the CSU room were changed. However, no other action was taken as a result of plaintiff's conversation with Lucky.

On January 27, 2015, plaintiff returned to working at Red Hook, and she worked with Davis. Plaintiff alleges on that day, Davis instructed her to start conducting "bed checks" (Kenney Dep. at 137) and cleaning the facility (id. at 91), which had not previously been part of

3

plaintiff's assigned duties. Plaintiff says that when she asked Davis details about how to perform bed checks, he yelled at her and told her she was being insubordinate.

On January 28, 2015, plaintiff met with Facility Director Smith and Smith's supervisor, Facility Manager Beverly Sowersby. Plaintiff told Smith and Sowersby about Davis's conduct toward her. The same day, Sowersby reported plaintiff's allegations to OCFS's Office of Equal Opportunity and Diversity Development ("EODD").

On January 29, 2015, Davis was assigned to "duty at home—a form of administrative leave." (Defs.' SOF ¶ 45). He was escorted out of Red Hook during his shift the same day.

From January 29, 2015, through June 12, 2015, while Davis was on administrative leave, plaintiff continued to work at Red Hook.

During this period, the EODD conducted an investigation into plaintiff's allegations. In an eight-page report dated June 12, 2015, the EODD noted that plaintiff's complaints against Davis were "concerning," and that plaintiff "appeared sincere and truthful in her statements alleging that [Davis]'s behavior toward her on multiple occasions made her feel uncomfortable and that supervisory boundaries were being crossed by" Davis. (Barkan Decl., Ex. J ("EODD Report") at 8). Nevertheless, the report found plaintiff's allegations "could not be substantiated by [the] investigation" and recommended no disciplinary action be taken against Davis. (Id.). However, the report did recommend that "the program area consider providing [Davis] with supervisory guidance to reinforce appropriate boundaries with colleagues and subordinates," and that "management may wish to consider temporarily assigning an alternate supervisor" to plaintiff. (Id.). The report also recognized "a lack of information provided to new hires as to their rights and recourse regarding a workplace free from discrimination," and recommended "a review of new employee training in this regard." (Id.).

On June 25, 2015, OCFS decided to permit Davis to return to active duty at Red Hook but instructed the Red Hook administration to assign Davis and plaintiff to different shifts. The same day, plaintiff met with Lucky, who told plaintiff she was going to need a drink. He then told plaintiff that Davis was coming back to work at Red Hook in two days. Lucky did not tell plaintiff that Davis and she would be assigned to different shifts. After telling her about Davis's impending return to Red Hook, Lucky asked plaintiff if she planned to quit. Plaintiff became upset, told Lucky that she was going to talk to her attorney, and left the facility.

On June 26, 2015, plaintiff emailed her supervisors at OCFS, stating "[t]he information that [she] received . . . regarding the return of Leon Davis ha[d] caused [her] a great deal of anxiety," and that she would "be seeking Mental Health services due to how [she] was notified . . . and the lack of concern, communication and safeguards." (Lucky Decl. Ex. G). Plaintiff also wrote that the "situation ha[d] caused [her] to feel unsafe" at Red Hook. (Id.).

On June 28, 2015, plaintiff called in sick. On June 29, plaintiff called OCFS to confirm the determination that Davis could return to work at Red Hook. Plaintiff was told her case was unfounded and that there was nothing she could do. The same day, plaintiff received the determination letter by email.

After she learned of Davis's return to Red Hook, plaintiff never went back to work. On June 30, 2015, plaintiff's psychotherapist submitted a note stating plaintiff was "not able to return to work due to her current mental status until further notice," and she submitted a workers compensation claim sometime thereafter. (Kenney Aff. Ex. 1; Kenney Dep. at 249).

Plaintiff claims she was never told she and Davis would be assigned to different shifts or that she could be transferred to another OCFS facility.

By letter dated April 12, 2016, OCFS terminated plaintiff. (Kenney Aff. Ex. 4).

5

**DISCUSSION**

I.   Legal Standard

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A fact is material when it "might affect the outcome of the suit under the governing law. . . . Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010) (citation omitted). It is the moving party's burden to establish the absence of any genuine issue of material fact. Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party has failed to make a sufficient showing on an essential element of his case on which she has the burden of proof, then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. at 323. If the non-moving party submits "merely colorable" evidence, summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249-50. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (internal citations

omitted). The mere existence of a scintilla of evidence in support of the non-moving party's position is likewise insufficient; there must be evidence on which the jury could reasonably find for her. Dawson v. Cty. of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party. Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). If there is any evidence from which a reasonable inference could be drawn in favor of the non-moving party on the issue on which summary judgment is sought, summary judgment is improper. See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004).

In deciding a motion for summary judgment, the Court need only consider evidence that would be admissible at trial. Nora Bevs., Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 746 (2d Cir. 1998).

II. Hostile Work Environment

Defendants argue (i) Davis's actions do not amount to a hostile work environment, and (ii) Davis's actions cannot be imputed to OCFS because he was not plaintiff's supervisor and there is no evidence OCFS was negligent in controlling working conditions.

Although the Court agrees Davis was not plaintiff's supervisor, it disagrees in all other respects.

A. Evidence of Hostile Work Environment

First, the Court concludes a reasonable jury could find Davis's conduct toward plaintiff amounted to a hostile work environment.

"[T]o establish a hostile work environment claim under Title VII, a plaintiff must produce enough evidence to show that the workplace is permeated with discriminatory

intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 20 (2d Cir. 2014) (internal quotation marks omitted). The standard has objective and subjective elements: "the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." Raspardo v. Carlone, 770 F.3d 97, 114 (2d Cir. 2014). "Whether a reasonable person would find a given work environment to be hostile depends on the totality of the circumstances; '[c]onsiderations include: (1) the frequency of the conduct, (2) the severity of the conduct, (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance, and (4) whether the conduct unreasonably interferes with the employee's work performance.'" Mormol v. Costco Wholesale Corp., 364 F.3d 54, 58 (2d Cir. 2004) (quoting Brennan v. Metro. Opera Ass'n, 192 F.3d 310, 318 (2d Cir. 1999)).

Here, as more fully described above, plaintiff testified Davis repeatedly and frequently said sexually harassing things to plaintiff and acted inappropriately toward her the majority of the time she worked with him. She describes multiple specific interactions that a reasonable jury could find objectively hostile, and she testified that she subjectively felt "extremely uncomfortable" at work. (Kenney Dep. at 97).

Defendants argue plaintiff's allegations are insufficient to constitute a hostile work environment because they consist of only "a handful of suggestive remarks and three ambiguous incidents occurring over the course of a matter of days." (Defs.' Br. at 15). The Court disagrees—a reasonable jury could easily conclude Davis's behavior toward plaintiff was persistent, pervasive, and created an abusive working environment for plaintiff. See Carrero v.

8

N.Y.C. Hous. Auth., 890 F.2d 569, 578 (2d Cir. 1989) ("A female employee need not subject herself to an extended period of demeaning and degrading provocation before being entitled to seek the remedies provided under Title VII.").

Accordingly, summary judgment is inappropriate on the issue of whether Davis created a hostile work environment for plaintiff at Red Hook.

B. OCFS Liability

Next, the Court concludes a reasonable jury could attribute liability to OCFS.

"The Supreme Court has ruled that employers are not automatically liable for sexual harassment perpetrated by their employees." Petrosino v. Bell Atl., 385 F.3d 210, 225 (2d Cir. 2004) (citing Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998); Faragher v. City of Boca Raton, 524 U.S. 775 (1998)). Instead, "[u]nder Title VII, an employer's liability for such harassment may depend on the status of the harasser." Vance v. Ball State Univ., 133 S. Ct. 2434, 2439 (2013).

"If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions." Vance v. Ball State Univ., 133 S. Ct. at 2439 (emphasis added). "In cases in which the harasser is a 'supervisor,' however, different rules apply." Id. (Emphasis added). Specifically, "if the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable." Id. However, "if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." Id. (citing Faragher v. City of Boca Raton, 524 U.S. at 807; Burlington Indus., Inc. v. Ellerth, 524 U.S. at 765).

9

### 1. Supervisor Under Title VII

Defendants argue Davis was not plaintiff's supervisor for Title VII purposes as a matter of law.

The Court agrees.

An employee is considered a "supervisor" "when the employer has empowered that employee to take tangible employment actions against the victim, i.e., to effect a 'significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" Vance v. Ball State Univ., 133 S. Ct. 2434, 2443 (2013) (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. at 761). In other words, a supervisor is an individual "'empowered by the company as a distinct class of agent to make economic decisions affecting other employees under his or her control.'" Id. at 2448 (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. at 762) (emphasis omitted). "[T]he question of supervisor status, when contested, can very often be resolved as a matter of law before trial." Id. at 2450.

Here, there is no evidence Davis could impose changes to plaintiff's employment status. Plaintiff testified she was interviewed for the job by Anthony Lucky and a "Mr. Benson," and it was her understanding that Lucky made the decision to hire her. (Kenney Dep. at 26-27). Defendants submitted a declaration from Facility Director Smith stating "AODs have no authority in firing, disciplining, transferring YDAs, and cannot alter a YDA's tasks and standards (or core job duties), work schedule, compensation, or benefits." (Smith Decl. at ¶ 11; see also Mary Carli Decl. ¶ 3). Smith declares that "[t]asks and standards, compensation and benefits for YDAs are set by Civil Service rules," and their work schedules are "generally determined by the

10

Facility Director, with input from the Assistant Facility Director and union representatives." (Id. at 12).

Nothing in the record contradicts this. Plaintiff's only argument in this regard is that the EODD investigation report indicated Lucky told the investigator he was concerned Davis was "too informal" with employees, employees did not look to Davis as a supervisor, and Lucky "had to twist [Davis's] arm to write people up." (Pl.'s Opp'n at 22). Plaintiff argues this suggests "Davis had authority to discipline [or at least recommend discipline] and, thus, constitutes a 'supervisor.'" (Id. at 23). This is unavailing. Plaintiff has offered no evidence Davis could discipline her in any tangible way. The ability to "write up" plaintiff or recommend discipline does not make Davis plaintiff's supervisor. See Travis v. City of Chi., 2014 WL 4909060, at *12 (N.D. Ill. Sept. 30, 2014) (employee who merely distributed daily work assignments and recommended discipline was not a supervisor under Title VII).

The only other record evidence suggesting Davis had some supervisory authority over plaintiff is that (i) the Tasks and Standards for someone in plaintiff's position states a YDA must inform the AOD "prior to leaving assigned post and receives permission from the AOD," and that a YDA must "never deviate[] from the schedule without the permission of the AOD" (Smith Decl. Ex. D), and (ii) Smith's testimony that "AODs may . . . direct YDAs to perform certain duties within the scope of a YDA's pre-set tasks and standards during his or her assigned shift." (Smith Decl. at ¶ 11). However, these factors also fall short of showing Davis had the ability to hire, fire, or otherwise take tangible employment actions against plaintiff. See Ward v. Shaddock, 2016 WL 4371752, at *9–11 (S.D.N.Y. Aug. 11, 2016) ("The allegation that [defendant] was responsible for Plaintiffs' 'day-to-day work assignments and allocation of equipment,' . . . falls well below that threshold.").

11

In short, no reasonable jury could find that Davis was plaintiff's supervisor for Title VII purposes. That being the case, to prevail on her hostile work environment claim, plaintiff must prove OCFS was negligent in controlling working conditions at Red Hook. Vance v. Ball State Univ., 133 S. Ct. at 2439.

2.  OCFS's Negligence

Although it is a close call, the Court concludes plaintiff has submitted sufficient evidence to create a genuine issue of material fact as to whether OCFS was negligent.

A plaintiff may show an employer is negligent in controlling working conditions by, for example, failing to "monitor the workplace, . . . respond to complaints, . . . provide a system for registering complaints, or [by] effectively discourag[ing] complaints from being filed." Vance v. Ball State Univ., 133 S. Ct. at 2453.

First, there is some evidence OCFS failed to respond appropriately to plaintiff's initial complaint about Davis. Plaintiff testified she had an "in-depth conversation" with Lucky in December 2014 or early January 2015, before she went to the off-site training, regarding Davis's conduct toward her. (Kenney Dep. at 137). At that time, the only action that was taken in response was to change the locks on the CSU door.

Second, there is some evidence OCFS failed to monitor the workplace. According to the EODD report, Lucky had "advised Mr. Davis that he was in the CSU too much, where he is off camera," and that "[b]oth Mr. Smith and Mr. Lucky stated that they advised male staff not to talk to female staff off-camera." (EODD Report at 7). Yet plaintiff's testimony suggests this is exactly what happened—Davis was frequently in the CSU with plaintiff when he engaged in the allegedly harassing behavior toward her. This occurred despite the fact that Lucky apparently knew Davis was "'too chummy with other staff,' and 'too informal.'" (Id.). In other words,

12

OCFS may have imposed appropriate restrictions, but there is evidence it failed to enforce those restrictions.

Third, there is some evidence OCFS did not provide an adequate system for registering complaints. Although OCFS has an employee handbook containing internal complaint procedures, there is a question as to whether plaintiff received the entire handbook initially. (See e.g., Kenney Dep. at 28.). In addition, regardless of whether plaintiff had a copy of the handbook, the EODD report casts doubt on how well it was disseminated and explained. Specifically, the report notes that the investigation "revealed a lack of information provided to new hires as to their rights and recourse regarding a workplace free from discrimination," and "recommend[ed] a review of new employee training in this regard." (EODD Report at 8). Finally, the casual way in which Lucky first responded to plaintiff's original complaint in December 2014 or early January 2015 and then the way he told plaintiff on June 25, 2015, about the decision to return Davis to work—without telling her they would be assigned to different shifts—provides additional evidence of a lax system for addressing complaints at Red Hook.

Based on the foregoing, the Court concludes questions of fact preclude summary judgment with respect whether OCFS was negligent in controlling working conditions.

III. Quid Pro Quo Harassment

Defendants argue they are entitled to summary judgment with respect to plaintiff's quid pro quo claim.

The Court agrees.

Quid pro quo sexual harassment occurs when an employer "alters an employee's job conditions or withholds an economic benefit because the employee refuses to submit to sexual demands." Carrero v. N.Y.C. Hous. Auth., 890 F.2d 569, 577 (2d Cir. 1989). "When a plaintiff

proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 753–54 (1998). See also Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 604 (2d Cir. 2006) ("To state a quid pro quo claim, [the plaintiff] must show a 'tangible employment action,' i.e., that an 'explicit . . . alteration[ ] in the terms or conditions of employment' resulted from her refusal to submit" to her supervisor's sexual advances.) (quoting Mormol v. Costco Wholesale Corp., 364 F.3d at 57).

"A tangible employment action usually 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 604 (2d Cir. 2006) (quoting Mormol v. Costco Wholesale Corp., 364 F.3d at 57). Such tangible employment actions "are established when a plaintiff proves that an action, such as a firing or demotion, resulted from a refusal to submit to a supervisor's sexual demands, or that an employer demanded sexual favors from an employee in return for a job benefit." Jin v. Metro. Life Ins. Co., 310 F.3d 84, 91 (2d Cir. 2002) (internal citations and quotation marks omitted). "A tangible employment action in most cases inflicts direct economic harm, but there is no requirement that it must always do so." Mormol v. Costco Wholesale Corp., 364 F.3d at 57 (internal citation and quotation marks omitted) (emphasis in the original).

Here—aside from the constructive discharge claim, which is discussed below—plaintiff appears only to allege she suffered tangible effects on her employment on January 27, 2015, when Davis yelled at her and assigned her new work duties—namely assigning her to perform

14

bed checks and clean certain areas of the facility—after she rebuffed his advances toward her. (See Pl.'s Resp. to Defs.' SOF ¶ 37; EODD Report at 5). Davis apparently then "documented [plaintiff's] insubordination 'in the AOD log book.'" (EODD Report at 6).

These allegations are insufficient as a matter of law to show a tangible employment action. There is no evidence that Davis's change in behavior or the change in plaintiff's duties affected plaintiff's pay, benefits, or employment status, or were a significant reassignment at Red Hook. This is especially true because plaintiff alleges that although she may have cleaned the facility, she did not in fact perform the bed checks, instead calling Smith about it, who told her she did not need to complete this task. (Kenney Dep. at 145). In addition, the EODD investigation revealed that "[c]leaning appear[ed] to be among several CSU tasks that were at the time still being clarified by the facility," and that Davis's "request to [plaintiff] regarding bed checks also seemed to be based on his understanding of an evolving policy." (EODD Report at 8). Finally, plaintiff continued to work at Red Hook for several months after this change in assignments while Davis was on administrative leave, undermining her claim that his actions on January 27, 2015, had a tangible effect on her employment.

Accordingly, plaintiff's quid pro quo harassment claim fails as a matter of law.

IV. Constructive Discharge

Defendants argue plaintiff's constructive discharge claim must also be dismissed.

The Court agrees.

"[A]n employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily." Petrosino v. Bell Atl., 385 F.3d 210, 229 (2d Cir. 2004) (internal quotation marks omitted). "[A] claim of constructive discharge must be dismissed as a matter of law unless the

evidence is sufficient to permit a rational trier of fact to infer that the employer deliberately created working conditions that were 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" Stetson v. Nynex Serv. Co., 995 F.2d 355, 361 (2d Cir. 1993) (quoting Pena v. Brattleboro Retreat, 702 F.2d 322, 325 (2d Cir. 1983)). To prove constructive discharge, plaintiff must show that a reasonable person subjected to the working conditions experienced by plaintiff would have felt compelled to resign. Pena v. Brattleboro Retreat, 702 F.2d at 325. See also Pa. State Police v. Suders, 542 U.S. 129, 134 (2004) ("to establish 'constructive discharge,' the plaintiff must . . . show that the abusive working environment became so intolerable that her resignation qualified as a fitting response"). "This standard is higher than the standard for establishing a hostile work environment." Fincher v. Depository Trust and Clearing Corp., 604 F.3d 712, 725 (2d Cir. 2010).

Here, plaintiff asserts she was constructively discharged because (i) "[d]uring the investigation, Smith repeatedly noted his support for Davis' return to his duties," (ii) "Lucky told plaintiff that Davis was returning in two days and asked her if [she] was going to quit," but failed to mention "any change in Davis' role," leading plaintiff to "reasonably underst[and] that Davis was going to return as her supervisor," and (iii) although she notified her supervisors of the reason for her absence from work, "none contacted her or suggested any recourse; none suggested that Davis was to work a different shift" and OCFS has failed to "demonstrate that it could not have otherwise employed plaintiff." (Pl.'s Opp'n at 26). Plaintiff argues based on the above, "a reasonable jury could conclude that defendant wanted plaintiff to quit her job, that Smith wanted Davis to return, that Lucky believed that Davis' return would cause plaintiff to quit precisely because she knew his return represented a repudiation of plaintiff's value to the defendant and her worth as a human being." (Id.).

The Court is not persuaded. Even viewing the totality of the circumstances as a whole, in the light most favorable to plaintiff, these alleged facts at most show negligence on the part of Lucky and Smith, not deliberate conduct intended to make plaintiff resign. To show deliberateness on the part of the employer, "something beyond mere negligence or ineffectiveness is required." Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 74 (2d Cir. 2000). As in Whidbee, Lucky and Smith's conduct "might be seen as evincing a lack of concern about the plaintiff['s] situation," but "this evidence does not support an inference that [they] intended to create intolerable workplace conditions." Id. In sum, "[a]s ineffective or even incompetent as [Lucky or Smith's] handling of the matter may have been, it does not rise to the level of deliberate action required" to show constructive discharge. Id.

Accordingly, plaintiff's constructive discharge claim must be dismissed.

V.  State of New York

Defendants argue the State of New York, as distinguished from OCFS, is not an appropriate defendant because Title VII only permits actions against an employer, and here, plaintiff's employer was OCFS, not the State. Plaintiff's opposition is devoid of any argument on this point, and in fact, it repeatedly refers to defendant as a singular entity or as OCFS. (See Pl.'s Opp'n at 1, 14, 26).

The Court agrees with defendants that plaintiff's employer was OCFS, not the State of New York, and that any claims plaintiff intended to assert against the State, as distinguished from OCFS, have been abandoned.

Accordingly, the State of New York is dismissed as a defendant.

**CONCLUSION**

Defendants' motion for summary judgment is GRANTED with respect to plaintiff's quid pro quo harassment claim and constructive discharge claim, and with respect to the State of New York as distinguished from OCFS. The motion is DENIED with respect to plaintiff's hostile work environment claim.

All counsel are directed to appear at a status conference on December 21, 2017, at 10:30 a.m., at which time the Court will set a trial date and a schedule for pretrial submissions.

By December 21, 2017, the parties shall submit a Joint Pretrial Order in accordance with the Court's Individual Practices.

The Clerk is instructed to terminate the motion (Doc. #30) and terminate the State of New York as a defendant.

Dated: November 20, 2017
       White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge